## IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | **SEALED** |
| | No: 4.20mj 9 |
| 290 HAISLIP LANE, AXTON, VA, | 4.20mj 10 |
| | 4.20 mj 11 |
| 324 HAISLIP LANE, AXTON, VA | 4.20mj 12 |
| 1738 MORGAN FORD ROAD, RIDGEWAY, VA | |
| 103 AXTON ROAD, AXTON, VA | |
| TO INCLUDE ALL OUTBUILDINGS, VEHICLES AND THE CURTILAGE SURROUNDING EACH RESIDENCE | |

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Aaron Durham, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the four premises known as (1) 290

HAISLIP LANE, AXTON, VA, (2) 324 HAISLIP LANE, AXTON, VA, (3) 1738 MORGAN

FORD ROAD, RIDGEWAY, VA, and (4) 103 AXTON ROAD, AXTON, VA, ("TARGET

ADDRESSES"), properties owned or controlled by Alejandro ESCARCEGA-Avila, Francisco

ALVAREZ-Consuelo, Meliton ROSALES-Alvarez, and Noe Salvador BECERRA-Gonzalez,

which further described in Attachment A, for the things described in Attachment B.

1

2.      I am a Task Force Officer with the Drug Enforcement Administration, and have been since August 2010. I am currently assigned to Enforcement Group 25, Roanoke Resident Office (RRO), of the DEA Washington Division Office.  I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses in violation of Title 18 and Title 21 of the United States Code.  I have received training in all areas of narcotics investigations including search and seizure laws and statutes pertaining to enforcement of the Controlled Substances Act.

3.      Since becoming a law enforcement officer in 2000, I have either conducted or assisted other law enforcement officers in conducting numerous narcotics investigations that have resulted in the arrest and conviction of numerous individuals.  I have attended classes and courses conducted by the DEA and other agencies regarding the importation, transportation, and distribution of illegal drugs.  I am knowledgeable about state and federal drug laws.  I have participated in a number of drug trafficking, money laundering, and organized crime investigations that have resulted in the arrest of numerous members of several different international and domestic drug trafficking organizations and the seizure of currency, assets, and drugs.  I have participated in many searches of residences and businesses of suspected drug traffickers for evidence of criminal activity.  I have also conducted and participated in the debriefing of many drug traffickers and money launderers, through which I have learned valuable information regarding the techniques used by drug trafficking organizations to distribute drugs in both domestic and international markets.  As a result of my training and experience, I am familiar with the way in which drug trafficking organizations illegally traffic,

transport, and distribute drugs and launder the proceeds derived from their drug distribution activity.

4.      The information contained within this affidavit is based on my personal experience as well as on information provided to me by other federal agents and local police officers.  I am aware that narcotics traffickers often keep drugs, firearms, U.S. Currency (USC), and records in their residences regarding the purchase of and sale of controlled substances and the laundering of the proceeds of those drug transactions. Such records have been recovered from multiple residences of targets of this investigation in prior authorized search warrants. Drug traffickers and those laundering the proceeds of drug trafficking in this investigation frequently use cell phones to communicate about their activities with coconspirators.  In this investigation, and during other investigations in which I have been involved, drug traffickers have kept records regarding cellular telephone billings, travel (airline, hotel and rental car) receipts, money transfers, ledgers with pay/owe information, firearms, ammunition, and controlled substances inside their homes.  All of this documentation can be used to identify unknown co-conspirators, and all of these items have significant evidentiary value in demonstrating involvement in drug trafficking and money laundering.

5.      The facts in this affidavit come from my training and experience as well as information obtained from other law enforcement officers and interviews with witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      This affidavit is submitted in support of a warrant to authorize the search of property described in Attachment A, which may constitute and contain records, fruits, instrumentalities and evidence of offenses involving violations of money laundering and

3

conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, conspiracy

to distribute controlled substances, in violation of 21 U.S.C. § 846, and unlawful use of a

communications facility to facilitate a drug trafficking offense, in violation of 21 U.S.C.

§ 843(b), (collectively "TARGET OFFENSES").

## <u>IDENTIFICATION OF THE PROPERTY TO BE SEARCHED</u>

7.      The property to be searched are four residences located at (1) 290 Haislip Lane, in

Axton; (2) 324 Haislip Lane, in Axton; (3) 1738 Morgan Ford Road, in Ridgeway; and (4) 103

Axton Road, in Axton.  Each of these residences is located within the Western District of

Virginia, and are described in more detail in Attachment A.

   a.      *1738 Morgan Ford Road, Ridgeway, Virginia:* Throughout the course of

this investigation, law enforcement has identified 1738 Morgan Ford Road, Ridgeway,

Virginia, as the primary residence of Alejandro ESCARCEGA-Avila based on public

records and surveillance.   ESCARCEGA-Avila has been identified as a money launderer

for the international drug trafficking and money laundering organization ("DTO/MLO")

in the Axton, Virginia, area.    Law enforcement determined the primary vehicle used by

ESCARCEGA-Avila is a blue Honda mini-van, Virginia registration VMD-3980,

registered to Jose Luis PARRA-Covarruvias, at 286 Murphy Road, Collinsville, Virginia.

On June 20, 2016, in Martinsville, Virginia, law enforcement conducting surveillance of

individuals known to be receiving kilogram quantities of cocaine observed

ESCARCEGA-Avila meeting with the individuals under surveillance. Those individuals

are believed by law enforcement to be operating within the same international drug

trafficking organization that is the subject of this investigation.  Law enforcement

observed ESCARCEGA-Avila during a controlled transfer of drug proceeds on March

21, 2019, which is described in more detail below, and communicated with

ESCARCEGA-Avila to arrange a controlled transfer of drug proceeds on July 17, 2019, which is described in more detail below.   It is known through telephone toll analysis, set forth in more detail below, that ESCARCEGA-Avila utilizes cellular phones to communicate with his drug trafficking coconspirators and money launderers, and changes numbers, using different subscriber information and the identity of others for that subscriber information to avoid detection by law enforcement.   Telephone toll analyses have identified the top contact of ESCARCEGA-Avila to be the cellular telephone number utilized by Francisco ALVAREZ-Consuelo.   On November 7, 2019, DEA RRO conducted surveillance on 1738 Morgan Ford Road, the residence of Alejandro ESCARCEGA-Avila.   DEA RRO observed ESCARCEGA-Avila leave 1738 Morgan Ford Road a blue Honda van.   On January 10, 2020, DEA RRO utilized a source of information to meet with ESCARCEGA-Avila at 1738 Morgan Ford Road.   The DEA RRO SOI had a brief conversation with ESCARCEGA-Avila and left the residence, confirming that he was still at the residence.

      b.    *290 Haislip Lane, Axton, Virginia:*  Throughout the course of this investigation, law enforcement has identified 290 Haislip Lane, Axton, Virginia, as the primary residence of Meliton ROSALES-Alvarez based on surveillance of ROSALES-Alvarez.   ROSALES-Alvarez is believed to be a close associate and drug distributor/money courier for ESCARCEGA-Avila, and the brother and neighbor to ALVAREZ-Consuelo. Since approximately 2006, ROSALES-Alvarez has been identified in the DEA RRO as a multiple kilogram cocaine and marijuana source of supply (SOS) in the Henry County and Pittsylvania County, Virginia areas. Law enforcement observed ROSALES-Alvarez make a controlled delivery of drug proceeds

on July 17, 2019, which is described in more detail below, and appeared to be at the
direction of ESCARCEGA-Avila.

      c.    ***324 Haislip Lane, Axton, Virginia:*** Throughout the course of this
investigation, law enforcement has identified 324 Haislip Lane, Axton, Virginia, as the
primary residence of Francisco ALVAREZ-Consuelo based on surveillance of
ALVAREZ-Consuelo.   Law enforcement observed ALVAREZ-Consuelo make a
controlled delivery of drug proceeds on March 21, 2019, which is described in more
detail below, and appeared to be at the direction of ESCARCEGA-Avila.  In 2018,
ALVAREZ-Consuelo was present at a location in Martinsville during a controlled
delivery of approximately fifteen pounds of marijuana.  In July 2019, a Federal tracking
warrant (ping), was obtained for a telephone used by ALVAREZ-Consuelo which was
subsequent to the controlled money transfers. The ping revealed the location of telephone
in the area of ALVAREZ-Consuelo's and ROSALES-Alvarez's residence. Telephone toll
analyses have shown that a telephone identified by law enforcement, which is utilized by
ALVAREZ-Consuelo, is the top contact of ESCARCEGA-Avila.

      d.    ***103 Axton Road, Axton, Virginia****:* Throughout the course of this
investigation, law enforcement has identified 103 Axton Road, Axton, Virginia, as the
primary residence of Noe Salvador BECERRA-Gonzalez based on surveillance of
BECERRA-Gonzalez.   Law enforcement observed BECERRA-Gonzalez make a
controlled delivery of drug proceeds on March 29, 2019, which is described in more
detail below.

## STATEMENT OF PROBABLE CAUSE

    8.    Based on my training and experience, including my direct experience with the
individuals involved in the specific international DTO/MLO involved in this investigation, I

believe that the residences located at the TARGET ADDRESSES are being utilized to store and/or secure drugs, U.S. Currency, and/or documentation related to money laundering and/or drug trafficking activities. Said documentation would include hard copy documentation, as well as digitally stored information.

*Background of Investigation*

9.      During the course of the investigation beginning in March 2015, DEA RRO, HSI Roanoke Office, and Henry County, Virginia, Sheriff's Office (HCSO), determined that a large-scale, Mexican-based, DTO/MLO was operating from Axton, Virginia, and Greensboro, North Carolina. This investigation revealed that the international DTO/MLO used stash house locations in Axton, Virginia, to move large quantities of drugs through the mid-Atlantic and eastern half of the United States. The individuals operating in Axton and Greensboro reported directly to, and received direction and instruction from, members of the Cartel Jalisco Nueva Generacion (CJNG) criminal organization in Mexico.[1]

10.     In June 2016, DEA RRO was contacted by the DEA Dallas Field Division (DEA DFD) about a tractor trailer that arrived in Dallas, Texas, to pick up a large piece of equipment.

---

[1] Based on my training, experience, and the information gathered from federal law enforcement agencies investigating this organization in Mexico and the United States, and the information determined in other investigations in the DEA RRO, I know that CJNG is a Mexican-based criminal organization controlling the large majority of cocaine, heroin, and methamphetamine trafficking in southern and western Mexico. Based originally in Guadalajara, Jalisco, Mexico, CJNG has recruited individuals from the regions of Jalisco, Nayarit, and Veracruz to transport drugs across the Mexican border and to distribute drugs in areas of the Western District of Virginia, including Axton, Virginia, and Winchester, Virginia. Once in Axton, CJNG members and their associates maintained several residential properties for the purpose of receiving, storing, packaging, and distributing multiple kilograms of cocaine, multiple kilograms of heroin, and multiple pounds of marijuana they further distributed. Those CJNG members and associates received large amounts of United States currency as payment for the controlled substances, and transmitted that currency to members and affiliates of CJNG based in Mexico, frequently laundering the money through wire transfers and bank accounts, and often transferring bulk cash to coconspirators engaged in money laundering activities.

Based on their independent investigation into drug trafficking activity, the DEA DFD suspected the equipment contained a large amount of cocaine that was destined for the Martinsville, Virginia, area. Agents with DEA DFD approached the truck driver, who provided a bill of lading showing an address to a business in Martinsville.

11.     Approximately three days later, DEA RRO conducted surveillance in the area of the business and observed the tractor trailer arrive at the business at approximately 6:50 am. A short time later, an unidentified Hispanic male ("UM 1") arrived at the business in a black 2016 Ford Fiesta rental car, North Carolina registration EBW-4429, and removed the equipment from the trailer. UM 1 stayed a very short time and briefly left the business in the Ford Fiesta. UM 1 returned to the business and drove the equipment into a warehouse building. Subsequently, UM 1 and another unidentified Hispanic male ("UM 2") left the business in the Ford Fiesta and drove repeatedly back and forth in front of the business, conducting what appeared to be counter-surveillance. A short time later, UM 1 and UM 2 met with the driver of a blue mini-van, Virginia registration VMD-3980, later determined to be ESCARCEGA-Avila. Surveillance units observed ESCARCEGA-Avila enter the Ford Fiesta with UM 1 and UM 2, and all three subjects left the area. For approximately 20 minutes, the three subjects drove repeatedly back and forth in front of the business, again conducting what appeared to be counter-surveillance. All three subjects then got in ESCARCEGA-Avila's blue van, and drove in the same manner in front of the business, conducting what appeared to be additional counter-surveillance.

12.     Later in the afternoon, law enforcement surveillance observed a silver Toyota arrive at the business where the equipment was delivered, followed by the black Ford Fiesta. After approximately three hours, the silver Toyota and black Ford Fiesta left the business. A traffic stop was conducted on the silver Toyota. A narcotics K-9 was utilized to conduct a free air

sniff around the silver Toyota, which had a positive alert for the presence of narcotics. Law enforcement searched the vehicle but did not locate any drugs.

13.     On February 1, 2018, law enforcement conducting an investigation into the same international DTO/MLO executed a total of seven (7) search warrants on residential locations in and around Axton, Virginia, and one vehicle stop after an intercepted communication indicated that the driver had picked up a delivery of cocaine from his sources of supply, Jose Alfredo SANTACRUZ-Godinez and Rogelio SANTACRUZ-Godinez.  As a result of these law enforcement actions that day, investigators recovered 11 kilograms of cocaine, 5 pounds of marijuana, 10 different firearms, and over $100,000 of US Currency.  Documents recovered during the searches included several different money ledgers, money transfer receipts, and other documents showing the connections between the properties and members of the international DTO/MLO, dating back several years.  Both Jose Alfredo SANTACRUZ-Godinez and Rogelio SANTACRUZ-Godinez were charged with a federal drug trafficking conspiracy, and Jose Alfredo SANTACRUZ-Godinez was later charged with a federal money laundering conspiracy.

14.     On February 6, 2018, law enforcement intercepted a bulk cash delivery of approximately $144,000 as payment for cocaine transactions, transported from Axton, Virginia, by Ramon CARILLO-Ruvalcaba and bound for delivery in Mexico.  CARILLO-Ruvalcaba worked for the same international DTO/MLO.  Law enforcement believes these proceeds were collected from cocaine deliveries completed prior to the search warrants executed on February 1, 2018.  Ramon CARILLO-Ruvalcaba was later charged with a federal drug trafficking conspiracy.

15.     On July 11, 2018, DEA RRO and Virginia State Police executed a state search warrant at a residence in Martinsville, Virginia, following the controlled delivery of

approximately 15 pounds of marijuana that had been intercepted by the Virginia State Police while scanning packages for drugs.[2]  During the search, law enforcement observed a money counting machine, a drug ledger detailing more than $4,000,000 in cocaine transactions,[3] and some firearms.  ALVAREZ-Consuelo was present at the residence during the state search warrant, and had a user amount of marijuana in his pocket.[4]

16.    Several months later, in 2018, DEA RRO received information from a confidential source of information (CS 1) that members of the international DTO/MLO had provided CS 1 with the names of individuals who were to receive large quantities of cocaine and marijuana from CS 1 for further distribution.  ALVAREZ-Consuelo and ROSALES-Alvarez were two of those individuals, and CS 1 identified both as drug associates working with ESCARCEGA-Avila.  As a result of the direction received by members of the international DTO/MLO operating in Mexico, CS 1 distributed approximately 20 kilograms of cocaine to ALVAREZ-Consuelo, and approximately six (6) kilograms of cocaine to ROSALES-Alvarez.

17.    In September 2018, law enforcement conducted a traffic stop involving Ana Bella SANCHEZ-Rios, after observing her driving a vehicle that picked up a controlled delivery of 20

---

[2] The package was initially delivered to 1711 Plantation Drive, Axton, Virginia, where it was picked up by CARILLO-Ruvalcaba, driven directly to the Martinsville address, and carried inside.  The package was delivered to the same residential address in Axton, Virginia, that was used on March 8, 2015, as a stash location for 5 kilograms of cocaine recovered by law enforcement, along with wire transfer documents, digital scales, and drug packaging material. That same address appeared as the delivery location for a commercial delivery of 478 grams of methamphetamine on April 8, 2016, which was subsequently intercepted by law enforcement.

[3] Although it was recovered during a search in July 2018, the ledger contained details of transactions dating back to September 2017.

[4] Cesar GONZALEZ-Parra owned the Martinsville home, and was present during the search. GONZALEZ-Parra and Jose Alfredo SANTACRUZ-Godinez had been present during a September 2015 meeting with an undercover agent with HSI in Richmond, Virginia, in which

pounds of marijuana from a suspected stash house for the international DTO/MLO.  At that time,

SANCHEZ-Rios was the owner and operator of a money service business in Axton, Virginia,

that CS 1 later identified as a point of money laundering for drug proceeds for the international

DTO/MLO.  Investigators conducted an extensive examination of the international wire transfers

sent from SANCHEZ-Rios's business to Ixtlan del Rio, Nayarit, Mexico.  Based on that

extensive investigation, law enforcement identified more than $4,000,000 in drug trafficking

proceeds laundered by wire transfers on behalf of this DTO/MLO over a period of 16 months.

Law enforcement recovered explicit communications between a member of the international

DTO/MLO operating in Mexico and SANCHEZ-Rios, directing SANCHEZ-Rios to send money

delivered to her in cash to specific recipients in Mexico during that time, and to structure the

transfers in an effort to avoid law enforcement detection.  These transactions were sent in the

names of several different individuals, and were sent to several different individuals in Ixtlan del

Rio.  Several other members of the international DTO/MLO, including ESCARCEGA-Avila,

transferred money using SANCHEZ-Rios's business to Ixtlan del Rio.

 18. Additionally, during an examination of the cellular device belonging to

SANCHEZ-Rios during the September 2018 traffic stop, law enforcement identified explicit

communications between a phone number subscribed to an individual living at 1738 Morgan

Ford Road, Ridgeway, Virginia, and SANCHEZ-Rios, directing SANCHEZ-Rios to send money

delivered to her in cash to specific recipients in Mexico and California.  Law enforcement

believes that ESCARCEGA-Avila was using that number at that time.

---

GONZALEZ-Parra and SANTACRUZ-Godinez were negotiating the transfer of 20 kilograms of
cocaine.

*Controlled Bulk Cash Deliveries*

19.     In 2019, agents with DEA 1, DEA 2, and DEA 3 developed confidential sources (CS) with information pertaining to money laundering operations on behalf of CJNG. Specifically, each CS received a contract to perform money laundering services on behalf of CJNG, and the contract involved a specific money transaction or series of money transactions spread across the United States.  In their capacity working under this contract, each CS would receive information from a member of CJNG that there was bulk cash ready for pick up, each CS would arrange for a courier to pick up the currency from a member or associate of CJNG, and each CS would ensure that bulk cash was laundered in the specific way identified by CJNG for those proceeds.

20.     For months, DEA 1, DEA 2, and DEA 3 each used their respective CS ("DEA 1 CS," "DEA 2 CS," and "DEA 3 CS") successfully to retrieve drug proceeds in other judicial districts with ongoing investigations of CJNG's drug trafficking and money laundering activity. Through these and through investigations in their own districts, DEA 1, DEA 2, and DEA 3 have identified individuals responsible for ordering their respective CS to collect and launder drug proceeds on behalf of CJNG.

*Controlled Bulk Cash Delivery: March 21, 2019*

21.     In March 2019, DEA 1 CS provided DEA 1 with information indicating that a transfer of drug proceeds was scheduled to occur in Axton, Virginia.  DEA 1 CS provided DEA 1 with (434) 857-6954 as the contact person to drop off the U.S. Currency. DEA RRO issued an Administrative Subpoena to Verizon Wireless for subscriber and toll records associated with

(434) 857-6954, and subsequently determined the number was subscribed to Aiden Hdz, 1162 Piney Forest Road, Danville, Virginia.[5]

22.     Subsequently, DEA 1 obtained a state tracking warrant (ping) for (434) 857-6954 and observed the operator of the device bearing that cellular telephone number continuously show in the area of Ridgeway, Virginia, which is located in Henry County in the Western District of Virginia.  Based on previous information received by DEA RRO, the ping was in the same general area as the residence associated with ESCARCEGA-Avila.  DEA RRO requested assistance from HCSO to attempt to identify vehicles at the residence, using a ruse to conceal their approach.  Law enforcement officers observed vehicles parked at the residence, including a 2007 blue Honda van with Virginia registration VMD-3980, which was the same vehicle observed during surveillance of the suspected drug delivery in June 2016.  During the interaction with the HCSO deputy at the residence in March 2019, the deputy's body worn camera captured the conversation with a Hispanic male, later positively identified by agents in this investigation reviewing the footage as ESCARCEGA-Avila.  The ping for (434) 857-6954 remained at the residence overnight, and agents conducting surveillance near the residence did not see the vehicle leave the residence during that time.

23.     On the following day, the ping on (434) 857-6954 appeared in the area of Axton, Virginia. DEA RRO travelled around the area of the ping and located a blue Honda van, believed to be the same vehicle observed at the Ridgeway residence associated with ESCARCEGA-Avila

---

[5] A search of law enforcement databases does not show the name of Aiden Hdz residing at the subscriber address or even existing in Virginia.

and from the previous surveillance operation in June 2016.[6]  On this day, that blue Honda van was at an address associated with ALVAREZ-Consuelo.

24.      During the investigation, DEA RRO provided undercover/confidential source assistance, using a confidential source (CS 2), to arrange for the pick-up of approximately $300,000 in drug proceeds.  On March 21, 2019, CS 2 contacted (434) 857-6954 and arranged for the transfer of drug proceeds for a location in Axton, Virginia. At approximately 5:03 p.m., CS 2 received a telephone call from a male, believed to be ESCARCEGA-Avila, from (434) 857-6954.  ESCARCEGA-Avila told CS 2 that he would be sending someone else to deliver the U.S. Currency.

25.      Surveillance teams were in place to observe the transaction, and saw ESCARCEGA-Avila and ALVAREZ-Consuelo traveling in tandem, but in separate vehicles, to the designated transaction location.  ESCARCEGA-Avila was driving the same blue Honda van observed at his residence in Ridgeway the previous day, and believed to be observed at the residence of ALVAREZ-Consuelo.  ALVAREZ-Consuelo was driving a burgundy and silver Dodge truck registered in his own name.  It is believed by law enforcement that they traveled from ALVAREZ-Consuelo's residence to the meet location.  Once there, a male, identified by law enforcement officers as ALVAREZ-Consuelo,[7] exited his vehicle and obtained a green bag from the truck he was driving.  Law enforcement later determined the green bag contained approximately $300,000 U.S. Currency.  ALVAREZ-Consuelo gave the green bag to CS 2, who placed it in the trunk of CS 2's vehicle. Approximately two minutes after CS 2 left the

---

[6] DEA RRO was unable to confirm the license plate on the blue Honda van due to the distance the van was parked from the street.

14

designated location, ESCARCEGA-Avila arrived at the transaction location in his blue Honda van and appeared to meet with ALVAREZ-Consuelo.

*Controlled Bulk Cash Delivery: March 29, 2019*

26.     Just a few days later, DEA 1 CS provided DEA 1 with information indicating that a transfer of approximately $100,000 in drug proceeds was scheduled to occur in Eden, North Carolina.  Because of the significant overlap in drug trafficking activities for CJNG-related targets between DEA Greensboro ("DEA GRO") and DEA RRO, DEA 1 requested surveillance assistance from both DEA GRO and DEA RRO in the event that the bulk cash would be delivered by an Axton-based money courier.

27.     The DEA 1 provided DEA GRO with a phone number of the contact person to drop off the U.S. Currency.  On March 29, 2019, an undercover officer working for DEA GRO ("DEA GRO UC") made contact with an unknown male (UM) at the provided number.  The unknown male advised the he would be driving a blue BMW.  Surveillance teams were in place to observe the blue BMW arrive and meet the DEA GRO UC at the designated transaction location in Eden, North Carolina.  The unidentified Hispanic male was driving a 2002 blue BMW Virginia registration UXL-6081, registered to Lorena Perez Sandoval at 768 Giles Rd., Axton, VA.

28.     The unknown male, wearing what appeared to be work clothes, a gray hat and red shirt, exited his vehicle and got into the DEA GRO UC vehicle.  The male obtained a bag containing a diaper box from the blue BMW he was driving, and placed the bag containing the

---

[7] A review of a covert video recording of the transaction allowed agents to positively identify ALVAREZ-Consuelo as the individual who handed the green bag to CS 2.  CS 2 also positively identified a photograph of ALVAREZ-Consuelo as the individual who gave CS 2 the green bag.

diaper box in to the passenger side of the DEA GRO UC vehicle.  Law enforcement later determined the diaper box contained $307,070 U.S. Currency.

29.     The DEA RRO and DEA GRO were able to identify the unknown Hispanic male as Noe Salvador BECERRA-Gonzalez. A review of a covert video recording of the transaction allowed agents to positively identify Noe Salvador BECERRA-Gonzalez as the individual who handed the diaper box to the DEA GRO UC.

30.     BECERRA-Gonzalez exited the UC vehicle and the DEA GRO UC left the designated location.  Approximately twenty four minutes after BECERRA-Gonzalez left the transaction location, the DEA RRO surveillance team observed BECERRA-Gonzalez, driving the blue BMW, arrive at 103 Axton Road, Axton, VA.  The DEA RRO observed the unidentified Hispanic male exit the vehicle at 103 Axton, Road and enter the shed to the left side of the residence.  Approximately three (3) minutes later, the DEA RRO observed the unidentified Hispanic male leave 103 Axton Road and travel to Max Kendall Lumber and Tin in the blue BMW.  By the appearance and clothing description, it appeared this individual was employed by Max Kendall Lumber and Tin.

31.     On January 2, 2020, the DEA RRO observed the blue BMW parked at 103 Axton Road, Axton, Virginia.  On January 3, 2020, the DEA RRO observed a Hispanic male that resembled BECERRA-Gonzalez, get into the blue BMW and drive to Max Kendall Lumber and Tin.  On January 8, 2020, DEA RRO observed BECERRA-Gonzalez come out of the residence at 103 Axton Road and stand on the front porch.  DEA RRO followed BECERRA-Gonzalez get into the blue BMW and drive to Max Kendall Lumber and Tin.

*Controlled Bulk Cash Delivery: July 17, 2019*

32.     During the investigation, the DEA RRO provided assistance to DEA 2 for a transfer of drug trafficking proceeds set to occur in Axton, Virginia, on behalf of the same international DTO/MLO involved in this case.  DEA 2 CS received a contract to launder money for CJNG and was given the telephone number of the contact person for the bulk cash transfer, an unknown individual using (434) 857-6409.

33.     On July 17, 2019, CS 2 contacted (434) 857-6409 and arranged for the transfer of drug proceeds for a location in Axton, Virginia.  At approximately 2:12 p.m., CS 2 received a telephone call from a male, believed to be ESCARCEGA-Avila,[8] from (434) 857-6409. ESCARCEGA-Avila told CS 2 that he would be sending someone else to deliver the U.S. Currency.  CS 2 received a text message from ESCARCEGA-Avila, instructing CS 2 to meet at 11170 Chatham Road, Axton, Virginia, which is the address of a dollar store.[9]

34.     Following the telephone calls between (434) 857-6409 and CS 2, telephone toll analysis shows that (434) 857-6409 called (276) 403-2134.  After obtaining a federal tracking warrant for location information for telephone number (276) 403-2134, law enforcement

---

[8] DEA RRO determined that ESCARCEGA-Avila was utilizing (434) 857-6409 at that time based on a Federal tracking warrant that was received on August 8, 2019, from U.S. Magistrate Judge Joel C. Hoppe, in Charlottesville, Virginia.  That tracking warrant showed that (434) 857-6409 was mostly located in the same area of ESCARCEGA-Avila's residence, previously identified by the ruse call conducted by the HCSO deputy in March 2019.  (434) 857-6409 was also "pinging" in the same area of the telephone number used by ESCARCEGA-Avila to coordinate the drug proceeds transfer in March 2019.  Furthermore, the tracking warrant showed that (434) 857-6409 traveled to the area of the shared residence of ALVAREZ-Consuelo and ROSALES-Alvarez residence on several occasions, similarly to the movements of ESCARCEGA-Avila during prior money transactions.

[9] Based on information gained during this investigation, this DTO/MLO had previously made exchanges of bulk cash from drug trafficking proceeds at a dollar store in Axton, Virginia.

concluded that ALVAREZ-Consuelo was using (276) 403-2134, based on surveillance confirming the locations returned through warrant.[10]

35.     Based on previous money pickups in the same area, DEA RRO set up surveillance in the area of 290 and 324 Haislip Lane, Axton, Virginia.  The DEA RRO observed a 1990 red Toyota vehicle[11] leave 290 Haislip Lane, drive to the Axton Dollar General store, and sit in the parking lot for several minutes.  The 1990 red Toyota left the Dollar General parking lot and drove back to 290 Haislip Lane.  Based on my training and experience, I believe the individual driving the 1990 red Toyota drove to the Dollar General parking lot to determine whether there was a law enforcement presence in the area prior to the transaction.

36.     At approximately 2:51 p.m., CS 2 received an incoming telephone call from ESCARCEGA-Avila on (434) 857-6409.  ESCARCEGA-Avila stated, "what kind of car are you in."  CS 2 responded with the description of his/her vehicle.  ESCARCEGA-Avila responded, "give the code/key to the guy to confirm it's the right number."[12]  ESCARCEGA-Avila asked

---

[10] Law enforcement confirmed the location information received on this phone was pinging regularly in the location of ALVAREZ-Consuelo's shared residence with ROSALES-Alvarez. On or about August 13, 2019, the location information provided during the operation of the tracking warrant on (276) 403-2134 appeared a specific location in the area of Martinsville, namely a residence in Collinsville, Virginia. On that occasion, DEA RRO contacted HCSO to conduct surveillance to further confirm the individual operating (276) 403-2134 at that time in Collinsville, Virginia. HCSO observed a Dodge truck, registered to ALVAREZ-Consuelo and seen being operated by ALVAREZ-Consuelo, at the specific residential location identified by the tracking warrant for the number. This truck was the only vehicle located at the residence on that occasion, and was the same truck observed by law enforcement during the March 2019 delivery of bulk cash made by ALVAREZ-Consuelo.

[11] The registered owner of this vehicle was Carla ALVAREZ, a relative of ALVAREZ-Consuelo and ROSALES-Alvarez.

[12] The individuals operating the international DTO/MLO that had contacted DEA 3 CS to arrange for the money transfer provided him/her with a specific serial number from a one dollar bill in U.S. Currency. That serial number was to be used during the money transfer.

18

CS 2 to call when he/she was at the location, told CS 2 to look for "a little Toyota," and advised he would "call him. He should be close to you."

37.     Surveillance teams observed CS 2 and a blue Toyota pickup arrive at the Dollar General parking lot within minutes of each other.  CS 2 exited his/her vehicle and met with the driver of the blue Toyota pickup truck.  CS 2 walked around to the driver's side of the bed of the truck and retrieved an animal feed bag that contained approximately $100,000 in drug proceeds. Surveillance teams observed the blue Toyota pickup truck pull into 324 Haislip Lane, Axton, Virginia after leaving the Dollar General store.  Surveillance teams identified Meliton ROSALES-Alvarez as the driver and only occupant of the blue Toyota pickup truck.  CS 2 positively identified a photograph of Meliton ROSALES-Alvarez as the delivery driver of the $100,000 money drop off.

*Controlled Bulk Cash Delivery: October 8, 2019*

38.     In October 2019, DEA 3 CS provided DEA 3 with information indicating that a transfer of approximately $1,200,000 in drug trafficking proceeds from the international DTO/MLO was to occur in the Axton, Virginia, area.  DEA 3 CS received a contract to launder money for CJNG and was given (434) 857-6409 as the individual to contact to coordinate the transfer.

39.     On October 8, 2019, ESCARCEGA-Avila contacted an undercover agent for DEA 3 ("DEA 3 UC") using (434) 857-6409 to arrange the details of the money transfer. ESCARCEGA-Avila instructed DEA 3 UC to meet at the Dollar General store, located at 11170 Chatham Road, Axton, Virginia.  That address is the same location for the money transfer in July 2019, and is the address for the Dollar General store.  DEA 3 UC and a confidential source ("CS 3") drove to the Dollar General and waited on the delivery of drug proceeds.  At approximately

6:37 p.m., a Hispanic male driving an older blue Toyota truck, known to be Meliton ROSALES-Alvarez, arrived at Dollar General and walked inside. ROSALES-Alvarez approached DEA 3 UC inside the Dollar General and DEA 3 UC directed ROSALES-Alvarez to speak with CS 3, who was still in the vehicle. ROSALES-Alvarez asked the CS 3 to follow him to a different location to conduct the transaction, but CS 3 declined to leave that location. ROSALES-Alvarez returned to the Blue Toyota pickup and was observed on his cellular telephone. At approximately 6:50 p.m., DEA 3 UC observed a white Toyota Tundra arrive at the Dollar General and park beside the UC vehicle. An unidentified Hispanic male exited the white Toyota and ROSALES-Alvarez approached CS 3 in the UC vehicle. CS 3 obtained a large black suitcase and a smaller black shoulder bag containing the drug proceeds from the unidentified Hispanic male and ROSALES-Alvarez.

40.     Agents searched the two bags and observed several vacuum-sealed bags of USC with writing on them. The USC was transported to DEA RRO for processing. The USC bundles were numbered 1 through 56 and each contained approximately $20,000.00 USC. Following the money transfer, ESCARCEGA-Avila made a series of outgoing telephone calls from (434) 857-6409 to DEA 3 UC requesting the "code" that was supposed to be given to the courier following the receipt of the USC, as the courier, ROSALES-Alvarez, had neglected to get the code first. DEA 3 UC sent ESCARCEGA-Avila a photograph of the "code" via ESCARCEGA-Avila's WhatsApp encrypted account, which is linked directly to the number (434) 857-6409.

41.     Based upon my training, expertise, and experience generally with DTO/MLOs, and specifically with the investigation into this particular DTO/MLO, I know that:

a.     Distributors of controlled substances and money launderers often keep ledger books, telephone books, receipts, drug/money customer lists, photographs and

other papers that identify co-conspirators and their locations or residences and that relate to the importation, transportation, purchasing and distribution of controlled substances and proceeds derived from said sales;[13]

  b. Drug traffickers generate substantial profits as a result of drug dealing which the courts have recognized as probative evidence of crimes motivated by greed, in particular, trafficking controlled substances. Drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement agencies. These assets often are placed in other person's names, even though the drug dealers continue to use these assets and exercise dominion and control over them. They also often maintain on hand large amounts of United States currency in order to operate and finance their ongoing drug business;[14]

  c. Drug traffickers commonly "front" (i.e. provide on consignment) controlled substances to their clients and the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them. It is common practice for large scale drug dealers to secrete contraband, proceeds and drug sales and records of drug transactions in secure locations within their residences, stash houses, and/or places of business for ready access and to conceal such items from law enforcement authorities. Persons involved in large scale drug trafficking often conceal in their residences, stash houses, and/or places of business, caches of drugs, large

---

[13] In this particular investigation, searches of residences of those individuals working for the international DTO/MLO revealed dozens of documents and papers related to stash house locations, drug proceeds, drug transfers, and identity of coconspirators, and they have retained these documents for months and years after the transactions.

amounts of currency, financial instruments, precious metals, jewelry, automobile titles and other items of value which are proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

d.     When drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits.  To accomplish this, drug traffickers may utilize, but are not limited to, domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks and money drafts;

e.     It is common practice for large-scale drug traffickers to travel to their source and distribution points to facilitate their trafficking.  After purchasing their drugs, drug traffickers often transport or cause to be transported their drugs to areas in which they will distribute them.  The methods of transportation include, but are not limited to, commercial carriers, private airplanes, ocean going motor vessels, rental or private automobiles, and government or contract mail carriers;

f.     Drug traffickers commonly cause to be taken photographs of themselves, their associates, their property and items used in the distribution of controlled substances. These traffickers usually maintain these photographs at their residences or places of business and on their cellular telephones and/or computers;

g.     Drug traffickers use safes, surreptitious compartments and money counting machines to count and store the profits of their narcotics business;

---

[14] In this particular investigation, searches of residences of those individuals working for the international DTO/MLO recovered substantial sums of US Currency, and documents revealing the use of drug proceeds to purchase those residences.

h.      Drug traffickers commonly possess at their residences, stash houses, or places of business, drugs, paraphernalia, and materials for packaging, cutting, weighing and distributing heroin, including, but not limited to scales, plastic wrap, and plastic baggies.

i.      Drug traffickers commonly use electronic devices and storage components including, but not limited to, cellular telephones, computers, telex machines, facsimile machines, currency counting machines, telephone answering machines, computer software, tapes, discs, CD, DVDs,  and audio tapes to store records of drug sales, ledgers, supplier's/customer's contact information, financial records, images, audio/video recordings and other related documents related to the trafficking and sale of narcotics.

## TECHNICAL TERMS

42.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

23

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       c.      Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

43.      As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES of a TARGET ADDRESS, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

44.      *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES of a TARGET ADDRESS, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

       a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

24

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES at the TARGET ADDRESSES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

25

file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described

26

herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to facilitate the commission of a drug trafficking and/or money laundering offense, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may

28

contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

46.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

g.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

h.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     i. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

  47. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

  48. Based on the aforementioned, I respectfully submit that there is probable cause to believe that the individuals described have engaged in offenses involving violations of money laundering and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and unlawful use of a communications facility to facilitate a drug trafficking offense, in violation of

21 U.S.C. § 843(b), and that there is probable cause to believe that the locations described in

Attachment A will contain evidence of these crimes, as described more fully in Attachment B.

Respectfully submitted,

Aaron Durham
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this _16_ day of January, 2020

THE HONORABLE ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF VIRGINIA